**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JON HARTSOUGH,**

   **Plaintiff,**

          **Civil Action 2:17-cv-0005**
          **Chief Magistrate Judge Elizabeth P. Deavers**

  **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

   **Defendant.**

## OPINION AND ORDER

Plaintiff, Jon Hartsough, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. This matter is before the Court for disposition based upon the parties' full consent (ECF Nos. 5, 8), and for consideration of Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's Memorandum in Opposition (ECF No. 18), and the administrative record (ECF No. 10). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I.  BACKGROUND

Plaintiff filed his current applications[1] for benefits in November 2013, alleging that he has been disabled since August 10, 2010, due to depression and neck, back, and shoulder pain. (R. at 499-500, 501-06, 520.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge

---

[1]Plaintiff previously filed for disability insurance benefits in August 2010, which was denied by an ALJ on October 17, 2012 and denied by the Appeals Counsel in November 2013. (R. at 318-36, 337-41.) Plaintiff did not appeal this decision and instead filed new applications.

Paul E. Yerian (the "ALJ") held a hearing on November 23, 2015, at which Plaintiff, represented by counsel, appeared and testified, along with Michael A. Klein, Ph.D., a vocational expert (the "VE"). (R. at 285-316.) On January 28, 2016, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 254-72.) On December 6, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-7.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony[2]

Plaintiff testified at the administrative hearing that he lives in a two story house with a roommate. (R. at 286.) He drives approximately two or three times per week for about ten minutes. (R. at 286-87.) Plaintiff testified that he does not go grocery shopping and that his roommate does the shopping. (R. at 294.) He does not perform any chores and watches television all day. (R. at 297-98.) Every "couple of days" he gets on his laptop computer to log into Facebook. (R. at 298.) Plaintiff stated that he only leaves his home once or twice per week when he drives down the highway to help relieve his stress. (R. at 294.) He does not attend any group, club, or church. (R. at 298.)

Plaintiff also testified that he becomes agitated easily "if somebody stresses me out." (R. at 293.) He has a few friends "that help me out." (R. at 294.) Plaintiff sees his mother a

---

[2]In addition to mental impairments, the Court acknowledges that Plaintiff alleges disability in part because of his exertional impairments. Plaintiff's Statement of Errors, however, focuses primarily on Plaintiff's mental impairments and limitations. Accordingly, the Court will focus its review of the hearing testimony and medical evidence on Plaintiff's mental impairments and limitations.

"couple times a week," and has no problems with his neighbors, because "they've known me all my life." (R. at 294-95.) Plaintiff also testified that he has "severe anxiety" for which he takes medication. (R. at 295.)

Plaintiff next testified that he has problems with his concentration and memory, noting he has been experiencing short term memory loss. (R. at 295.) Plaintiff testified that he takes all his prescribed medications and that his medications cause drowsiness. (R. at 296-97.) According to Plaintiff, his bipolar disorder medication is helpful only for a short time. (R. at 305.)

**B. Vocational Expert Testimony**

Michael A. Klein, Ph.D. testified as the vocational expert at the hearing. (R. at 309-16.) The VE acknowledged that the prior administrative decision listed Plaintiff's past relevant work as a carpenter, a skilled, medium exertion job that Plaintiff performed at the very heavy level; a drywall supervisor, a skilled, very heavy exertion job; an auto detailer, an unskilled, medium exertion job that Plaintiff performed at the very heavy level; and a bagel baker, a semi-skilled, medium exertion job that Plaintiff performed at the light level. (R. at 310, 330.)

The ALJ proposed a series of hypothetical questions regarding Plaintiff's residual functional capacity to the VE. (R. at 311-12.) Based on Plaintiff's age, education, and work experience and the residual functional capacity ("RFC") ultimately determined by the ALJ, the VE testified that Plaintiff could perform 7,300 illustrative unskilled, sedentary jobs in the state economy and 305,000 sedentary jobs in the national economy such as order clerk, grader/sorter, or surveillance system monitor. (R. at 312.)

The VE also testified that that typical absenteeism is permitted up to one day a month and that anything above 10% usually precludes competitive employment. (*Id.*) The VE further

testified that, if the individual could only maintain attention and concentration for one hour at a time before needing a break due to pain or other subjective complaints, that frequency of break time would require special accommodation.   (R. at 312-13.)

### III.   MEDICAL RECORDS

**A.   Access Ohio**

The first treatment note in the administrative record from Access Ohio shows that Plaintiff presented for treatment on January 2, 2013, due to depression with isolation, increased appetite, feelings of sadness and hopelessness, and anger outbursts.   (R. at 744, 752.)   He reported he was previously taking Paxil, Xanax, sleeping pills and valium "been on for years" and the medication was discontinued due to moving to Ohio from Florida.   (R. at 747.)   He was diagnosed with a mood disorder and assigned a Global Assessment of Functioning ("GAF") score of 55.   (R. at 753.)   Plaintiff was recommended for pharmaceutical management, counseling and CPST (Community Psychiatric Support Treatment).   (*Id.*)

On January 18, 2013, Plaintiff met with CPST and he was found to be anxious and depressed with a flat affect.   He discussed his living situation with his father.   (R. at 760.)

APRN Kimberly Harris evaluated Plaintiff on January 21, 2013.   (R. at 761-65.)   He complained of feeling depressed "all day long" and described self-isolating behavior, decreased energy, and decreased interaction and motivation with feeling worthless, hopeless and guilty. Plaintiff also described struggling and extreme irritability.   (*Id.*)   Plaintiff stated that he lives with his elderly father who struggles with chronic alcoholism and dementia, which Plaintiff feels contributes to his mood instability.   (R. at 761-62.)   Plaintiff also discussed his illicit drug use. (R. at 763.)   Ms. Harris found Plaintiff to have a depressed, anxious, and irritable mood.   (R. at

764.)   He was cooperative, but restless with poor insight and judgment.   (*Id.*)   Ms. Harris

diagnosed Plaintiff with a mood disorder and cannabis abuse and assigned a GAF of 54.   (*Id.*)

Ms Harris prescribed Trileptal for mood instability and Lunesta for insomnia and noted Plaintiff

takes Xanax as prescribed by another clinician.   (R. at 765.)   She recommended psychotherapy

and discontinued marijuana use.   (*Id.*)

Dr. Stephen Bittner first prescribed Metroprolol for Plaintiff on May 14, 2013.   (R. at

781.)   The same day, Plaintiff reported he has been taking his medications as prescribed without

any symptoms.   (R. at 782.)   Plaintiff reported he was in the hospital for the last couple of days

due to chest pain and thought he was having another heart attack.   (*Id.*)   He also reported that his

fiancee would be coming to Ohio in three weeks and will be moving up not long after that.   (*Id.*)

He reported he is happy and is ready to start his life with her.   (*Id.*)

On June 12, 2013, Dr. Bittner and APRN Kimberly Harris opined that Plaintiff had a "rare"

ability, i.e., activity that could not be performed for any appreciable time, in the areas of dealing

with the public, socializing, behaving in an emotionally stable manner, completing a normal

workday and workweek without interruptions from psychologically based symptoms, and

performing at a consistent pace without an unreasonable number and length of rest periods.   (R. at

742-43.)   Dr. Bittner diagnosed Plaintiff with a mood disorder not otherwise specified with

symptoms including ongoing mood fluctuation, extreme agitation, irritability, intolerance,

depression, and anxiety with poor ability to cope in various situations.   (R. at 743.)

Indrani Naskar, M.D., evaluated Plaintiff on August 22, 2013. (R. at 923-26.)   Dr. Naskar

found Plaintiff to have a depressed and anxious mood with a constrictive affect.   (R. at 925.)   He

was cooperative, but restless with fair insight and judgment.   (*Id.*)   Dr. Naskar diagnosed

Plaintiff with Bipolar I Disorder and assigned a GAF score in the range of 50-55. (*Id.*) Dr. Naskar also adjusted his medications. (R. at 926.)

On November 26, 2013, Plaintiff reported he was suffering from increased stress due to his strained relationship with his girlfriend. (R. at 1009.) He also reported poor sleep, increased anxiety and anger, but no physically aggressive episodes. (*Id.*) On mental status examination, Dr. Naskar found Plaintiff was casually dressed, his thought process was logical; he reported no delusions or hallucinations. (*Id.*) Plaintiff demonstrated an anxious and depressed mood, normal behavior, and fair insight and judgment. (R. at 1009-10.) Dr. Naskar prescribed Seroquel and increased Plaintiff's Ativan to help with his anxiety. (R. at 1010.) The same day, Dr. Naskar opined that due to Plaintiff's bipolar disorder, he is "unable to perform in a work setting." (R. at 1008.) In December 2013, Dr. Naskar found a logical thought process, "better" mood and affect, normal behavior, no suicidal or homicidal ideation, intact cognition, and fair insight and judgment. (R. at 1004.)

On February 11, 2014, Dr. Naskar completed a medical source statement in which she reported that Plaintiff had a rare ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, deal with work stress, maintain regular attendance, and be punctual within customary tolerance. (R. at 1026.) She noted she had been treating Plaintiff since August 22, 2013. (R. at 1027.)

On February 20, 2014, Dr. Naskar reported logical thought processes, no delusions, depressed mood, restricted affect, no suicidal or homicidal ideation, normal behavior, intact cognition, and fair insight and judgment. (R. at 1236.) On March 14, 2014, Plaintiff reported

anxiety and some panic attacks. (R. at 1234.) Dr. Naskar noted that Plaintiff displayed logical thought processes, no delusions, depressed mood, full affect, no suicidal or homicidal ideation, normal behavior, intact cognition, and fair insight and judgment. (R. at 1234.)

On April 22, 2014, Dr. Naskar opined that, based on his treatment for Bipolar I Disorder, Plaintiff's symptoms render him "unable to perform in a work setting." (R. at 1064.) She reported logical thought process, no delusions, depressed mood, restricted affect, no suicidal or homicidal ideation, normal behavior, intact cognition, and fair insight and judgment. (R. at 1232.)

On May 27, 2014, Dr. Naskar reported that Plaintiff was being treated for bipolar disorder and PTSD and that he has symptoms including shifts in mood, flashbacks, and panic attacks. (R. at 1063.) Dr. Naskar reported that Plaintiff's anxiety and frequent panic attacks make it exceedingly difficult for him to function in the community and interact with others and that his depression affects his ability to be motivated to do many day to day tasks. (*Id*.) Dr. Naskar opined that Plaintiff would be unable to retain direction and perform work related tasks. (*Id*.) She concluded that Plaintiff would be "unable to function in a work-type setting at this time." (R. at 1063.) She reported that Plaintiff had logical thought processes, no delusions, depressed mood, anxious and restricted affect, no suicidal or homicidal ideation, normal behavior, intact cognition, and fair insight and judgment. (R. at 1230.)

In July 2014, Dr. Naskar reported that Plaintiff suffered no side effects from medication, and demonstrated logical thought processes, no delusions, no suicidal or homicidal ideation, normal behavior, intact cognition, and fair insight and judgment. (R. at 1228.) In November 2014, Plaintiff reported that he was "doing better" and that things with his girlfriend were "good."

(R. at 1217.)   Dr. Naskar reported logical thought processes, no delusions, less depressed mood, restricted affect, no suicidal or homicidal ideation, normal behavior, intact cognition, and fair insight and judgment.   (R. at 1217.)

In January 2015, Plaintiff reported that he was doing some work for a friend and that Christmas with his mother was good.   (R. at 1213.)   He had fair sleep and appetite.   (*Id*.)   Dr. Naskar found Plaintiff exhibited a stable mood, logical thought processes, no delusions, no suicidal or homicidal ideation, normal behavior, intact cognition, and fair insight and judgment. (R. at 1213-14.)   Plaintiff presented in February 2015, with "some depression and anxiety" but otherwise had logical thought processes, no delusions, no suicidal or homicidal ideation, normal behavior, intact cognition, and fair insight and judgment.   (R. at 1211-12.)   By April 2015, Plaintiff reported to Dr. Naskar that he was busy cleaning his home because his girlfriend was moving in with him.   (R. at 1240.)   He was also reporting doing some work for friends.   (*Id*.) Plaintiff's overall mood was ok, and Dr. Naskar found him to be stable with an unremarkable mental status examination.   (*Id*.)   In May 2015, Plaintiff told Dr. Naskar that he was "[d]oing better somewhat."   (R. at 1261.)   Plaintiff reported poor sleep, a good appetite, and weight loss. (*Id*.)   His mental status examination was unchanged.   (*Id*.)   Plaintiff also underwent an assessment update in May 2015, in which he reported he owns a home and lives alone and "knows how to survive, reliable, honest and social."   (R. at 1269.)   When discussing his depression, Plaintiff reported he has been manic in the last week and triggers of depression are caused by knowing he cannot work like he used to.   (*Id.*)   On June 3, 2015, Jennifer Bloom, LSW, found Plaintiff to have an euthymic mood, full affect, cooperative behavior, no problems with memory or attention/concentration, and above average intelligence.   (R. at 1273.)

On October 14, 2015, Dr. Naskar completed a medical source statement finding Plaintiff has a rare ability to function in the areas of socializing, relate predictably in social situations, interact with supervisors, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.   (R. at 1399-1400.)

On January 7, 2016, Dr. Naskar found Plaintiff to be cooperative with good eye contact and to have normal psychomotor activity, focused attention, intact concentration, normal affect, and appropriate mood.   (R. at 1533.)   He exhibited a logical thought process, no delusions, no suicidal or homicidal ideation, good insight and judgment, normal memory, and good capacity for activities of daily living.   (*Id*.)   On January 25, 2016, Plaintiff reported he was having shoulder surgery the next day.   He reported that his current medication had "helped with his mood a lot" and Dr. Naskar noted that his symptoms were "improving."   (R. at 1534.)   On mental status examination, Plaintiff was cooperative, with good eye contact, normal psychomotor activity, focused attention, intact concentration, normal affect and appropriate mood, with logical thought process, no delusions, no suicidal or homicidal ideation, good insight and judgment, normal memory, good capacity for activities of daily living, and no medication side effects.   (R. at 1535.)

**B.   State Agency Evaluation**

State agency psychologist, David Dietz, Ph.D. reviewed the file in January 2014 and found that the record documents medically determinable impairments of affective disorders and substance abuse disorders.   (R. at 351.)   According to Dr. Dietz, Plaintiff had mild restrictions in his activities of daily living; mild difficulties in maintaining social functioning; and, moderate difficulties in maintaining concentration, persistence and pace.   (*Id.*)   Dr. Deitz found that

Plaintiff's statements are partially credible noting that Plaintiff "alleges he cannot work due to mental health (based on [activity of daily living] form seems to be primary allegation). In the [mental health] records, he reports lining up 'side jobs' and doing much better when he is consistent [with] treatment." (R. at 353.) Dr. Deitz concluded that Plaintiff is capable of routine, repetitive work activities that don't involve extended periods of concentration, pace or persistence; and he is capable of predictable work activities where expectations do not frequently or dramatically change. (R. at 356-57.)

State agency psychologist, Aracelias Rivera, Psy.D., reviewed the file upon reconsideration in April 2014 and affirmed Dr. Deitz's assessment. (R. at 392, 397-98.)

## C. Appeals Council Exhibits

On February 29, 2016, Plaintiff was examined by orthopedic surgeon, Nathaniel Long, D.O., for complaints of right shoulder pain following a fall on his shoulder. (R. at 95-96.) Dr. Long noted that Plaintiff was doing "[o]verall very well" and that his pain is "well controlled." (R. at 95.) Dr. Long felt that Plaintiff was "progressing well with passive ROM." (*Id*.) Dr. Long found that Plaintiff's "[h]ardware remains well aligned," but wanted to "rule out a rotator cuff tear secondary to his fall." (R. at 96.) In April 2016, Plaintiff reported that he had fallen twice, one time feeling a "pop." (R. at 168.) Plaintiff reported that he now experiences "severe" pain and "can no longer even lift a coffee cup." (*Id.* ) X-rays revealed that his shoulder arthroplasty is stable. (R. at 169.) Plaintiff underwent an ultrasound on April 26, 2016 which revealed some subscapularis tearing. (R. at 181-82.) On May 11, 2016, Benjamin A. Schnee, D.O. examined Plaintiff and characterized his falls as "nasty" and speculated that Plaintiff "tor[e] a portion of his subscapularis . . . . Perhaps he knocked his glenoid component loose with one of these falls." (R. at 181.) On May 17, 2016 Plaintiff underwent a diagnostic arthroscopy and

extensive debridement and removal of the glenoid component.   (R. at 184-85.)   Plaintiff's surgeon found the damaged glenoid component to be "an obvious source of his pain.   This loose glenoid component is consistent with multiple traumas in the postoperative time period."   (R. at 185.)

The additional records submitted to the Appeals Council show Plaintiff saw primary care physician, Andrew Vollmar, M.D., on March 23, 2016, for follow-up of an emergency room visit for a kidney stone.   Plaintiff underwent right shoulder surgery on January 26, 2016 and was recovering well until he suffered a fall in February 2016, resulting in increased shoulder pain.   (R. at 79.)   Plaintiff had been successfully following a course of physical therapy but had to stop following the February 2016 fall.   (*Id.*)   On May 31, 2016 Dr. Vollmar completed a residual functional capacity assessment in which he opined that Plaintiff was limited to lifting ten pounds occasionally; occasionally perform all postural activities; rarely reaching or pushing/pulling; occasionally performing fine or gross manipulation; and never work around moving machinery and pulmonary irritants.   (R. at 196-197.)   Dr. Vollmar also reported that Plaintiff experiences severe pain; requires a sit/stand/walk at will option; and, will require additional rest breaks totaling half an hour per day.   (R. at 197.)

Plaintiff also submitted to the Appeals Council additional treatment records from Dr. Naskar.   On April 4, 2016, Plaintiff complained of frustration and poor sleep and explained he "is not happy with his right shoulder outcome."   (R. at 80.)   Dr. Naskar found Plaintiff had a normal affect and appropriate mood.   (*Id.*)   On May 9, 2016, Plaintiff reported that he was flying to Florida for a vacation.   His mood was noted to be fair and his sleep good.   (R. at 89.)   On June 22, 2016, Plaintiff reported that he did not go to Florida.   Dr. Naskar found Plaintiff had a constricted affect and fluctuating mood.   (R. at 90.)   Dr. Naskar noted that Plaintiff brought a

form to fill out from his social security lawyer.   (*Id.*)   On that form, Dr. Naskar again opined that

Plaintiff has a rare ability to maintain attention and concentration for extended periods of two hour

segments and complete a normal workday and workweek without interruptions from

psychologically based symptoms and perform at a consistent pace without an unreasonable

number and length of rest periods.   (R. at 186-87.)

## IV.   THE ADMINISTRATIVE DECISION

On January 28 2016, the ALJ issued his decision.   (R. at 254-72.)   The ALJ found that

Plaintiff met the insured status requirements of the Social Security Act through June 30, 2015.

(R. at 257.)   At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not

engaged in substantially gainful activity since August 10, 2010, the alleged onset date.   (*Id.*)   The

ALJ found that Plaintiff had the severe impairments of status post shoulder surgery,

status post lumbar spine fusion at L4-5 and laminectomy at L2-3, status post coronary artery

bypass, status post cervical fusion, chronic obstructive pulmonary disease, affective disorder,

anxiety disorder, and cannabis abuse.   (*Id.*)   The ALJ also found that Plaintiff's hyperlipidemia,

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

hypertriglyceridemia, hypercholesterolemia are not severe impairments, along with the non-severe impairments characterized as a pain disorder with a general medical condition and psychological factors affecting physical condition and an attention deficit hyperactivity disorder as found by the prior ALJ.   (R. at 258.)   He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (*Id.*)   At step four of the sequential process, the ALJ evaluated Plaintiff's RFC.   The ALJ found as follows:

> that [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he cannot climb ladders, ropes, or scaffolds, or work around hazards such as unprotected heights or dangerous machinery.   [Plaintiff] can frequently balance and occasionally climb stairs or ramps, stoop, kneel, crouch, and crawl.   [Plaintiff] can occasionally reach overhead with both upper extremities.   [Plaintiff] can have frequent exposure to fumes, dusts, odors, or poorly ventilated areas.   [Plaintiff] can perform only routine and repetitive tasks where there are infrequent changes in work duties or processes that do not involve a fast assembly line pace or strict production quotas.

(R. at 262-63.)   In reaching this determination, as to Plaintiff's mental RFC, the ALJ accorded great weight to the opinions of Drs. Dietz and Rivera, the State Agency consultant psychologists, finding their opinions are consistent with the record as a whole.   (R. at 261-62.)

The ALJ assigned "minimal" weight to Dr. Naskar's statements of unemployability of November 2013, April and May 2014; and the functional assessments of February 2014 and October 2015 finding them "inconsistent with the entirety of the medical records which reflects grossly normal cognitive and emotional functioning on various mental appointments throughout 2013, 2014, and 2015…".   (R. at 266-67.)   The ALJ also determined that the opinions were inconsistent with Dr. Naskar's own unremarkable treatment notes.   (*Id.*)

The ALJ also gave "minimal" weight to the assessment form completed by Dr. Brittner, finding "the record is not clear as to whether the doctor actually examined the claimant in a clinical

setting" and "as to what basis Dr. Brittner based any of his stated opinions." (R. at 267.) In addition the ALJ determined that this "opinion is based primarily upon the claimant's subjective allegations that are unsupported by documentary medical evidence." (R. at 268).

The ALJ further noted that Plaintiff's allegations as to the frequency, severity and duration of his mental health symtoms is not supported by the actual clinical findings. While noted as depressed and anxious, clinical notes show him as cooperative, active socially, and as working for free for others. (R. at 269.)

Relying on the VE's testimony, the ALJ determined that even though Plaintiff is unable to perform his past relevant work, other jobs exist in the national economy that Plaintiff can perform. (R. at 270-72.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 272.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

In his Statement of Errors, Plaintiff asserts that the ALJ erred by failing to give the appropriate weight to the opinions of his treating psychiatrists, Drs. Brittner and Naskar. (ECF No. 15 at 17-23.) In addition, Plaintiff seeks a remand under Sentence 6 of 42 U.S.C. §405(g) for further proceedings on the grounds that the administrative record contains new and material evidence. (*Id.* at 24-27.)

### A.   Weight Assigned to Medical Source Opinions

In evaluating a claimant's case, the ALJ must consider all medical opinions that she receives. 20 C.F.R. § 416.927(c). Medical opinions include any "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the [claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that

16

his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 f.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

**1. Dr. Naskar's Treating Source Opinion**

In his opinion, the ALJ listed several *Wilson* factors that influenced his decision not to give Dr. Naskar's treating source opinion controlling weight. The ALJ noted that Dr. Naskar's findings are inconsistent with the record as a whole, as well as with his own treatment notes. (R. at 267.) The ALJ correctly concludes that the medical evidence of record "reflects grossly normal cognitive and emotional functioning on various mental appointments throughout 2013, 2014, and 2015." (*Id*.) Dr. Naskar himself noted, at various times, improved mood, unremarkable mental status exam findings, logical thought processes, no delusions, normal behavior, intact cognition, and fair insight and judgment. (R. at 1228, 1238.) As the ALJ pointed out, Dr. Naskar's extreme

assessments were not supported by his mental status examination findings or his own treatment notes. *See* 20 C.F.R. § 404.1527(c)(3) (identifying "supportability" as a relevant consideration). Moreover, the degree of impairment Dr. Naskar assessed is more extreme than that offered by any of the other medical sources. *See* Blakley, 581 F.3d at 406 (quoting SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996)) ("'[I]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if . . . it is inconsistent with other substantial evidence in the case record.'").

Substantial evidence supports the ALJ's decision to discount Dr. Naskar's opinions. For instance, in January 2015, Dr. Naskar found Plaintiff exhibited a stable mood, logical thought processes, no delusions, no suicidal or homicidal ideation, normal behavior, intact cognition, and fair insight and judgment. (R. at 1213-14.) Plaintiff presented in February 2015, with "some depression and anxiety" but otherwise had logical thought processes, no delusions, no suicidal or homicidal ideation, normal behavior, intact cognition, and fair insight and judgment. (R. at 1211-12.) In April 2015, Dr. Naskar found Plaintiff to be stable after an unremarkable mental status examination. (R. at 1240.) In May 2015, Plaintiff told Dr. Naskar that he was "[d]oing better somewhat." (R. at 1261.) The results of Plaintiff's mental status examination were unchanged. (*Id.*) In June 2015, Jennifer Bloom, LSW, found Plaintiff to have an euthymic mood, full affect, cooperative behavior, no problems with memory or attention/concentration, and was noted to have above average intelligence. (R. at 1273.)

On January 7, 2016, Plaintiff was found to be cooperative, with good eye contact, normal psychomotor activity, focused attention, intact concentration, normal affect and appropriate mood. (R. at 1533.) He exhibited a logical thought process, no delusions, no suicidal or homicidal ideation, good insight and judgment, normal memory, and good capacity for activities of daily

living.  (*Id.*)  On January 25, 2016, Plaintiff reported that his current medication had "helped with his mood a lot" and Dr. Naskar noted that his symptoms were "improving."  (R. at 1534.)  On mental status examination, Plaintiff was cooperative, with good eye contact, normal psychomotor activity, focused attention, intact concentration, normal affect and appropriate mood, with logical thought process, no delusions, no suicidal or homicidal ideation, good insight and judgment, normal memory, good capacity for activities of daily living, and no medication side effects.  (R. at 1535.)[3]

All of this evidence amply supports the ALJ's conclusion that Dr. Naskar's opinions were not entitled to controlling weight.  The ALJ correctly discounted his opinions and articulated good reasons for doing so.  *Wilson*, 378 F.3d at 544.

For the reasons explained above, the Court finds that the ALJ properly gave good reasons for the weight assigned to Dr. Naskar's treating source opinion, and substantial evidence supports his reasoning and conclusions.

### 2.  Dr. Brittner's Opinion Evidence

As a preliminary matter, the Court notes that Dr. Brittner is not a treating source. Nevertheless, the ALJ addressed the factors set forth in 20 C.F.R. § 416.927(c).  Most importantly, the ALJ noted that it is not possible to determine the objective bases of Dr. Brittner's opinion.  (R. at 267.)  Dr. Brittner did not provide or identify any particular medical or clinical findings that support his assessment.  (R. at 742-743.)  Because Dr. Brittner provided no

---

[3] The Court notes that the ALJ also properly rejected Dr. Naskar's various statements that Plaintiff cannot perform work at any level.  These types of opinions relate to the ultimate question of disability, which is an issue reserved for the Commissioner.  Accordingly, the ALJ is not required to give these statements any particular weight.  SSR 96–5p, 1996 WL 374183, at *5 (1996) ("Medical sources often offer opinions about whether an individual ... is 'disabled' or 'unable to work[.]'  . . .  Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner.").

objective evidence in support of his findings, the ALJ was left to conclude that Dr. Brittner based his conclusions on Plaintiff's subjective reports.   (R. at 268.)   On such occasions, the ALJ is correct to discount medical opinion evidence.   *Mitchell v. Comm'r of Soc. Sec.*, 330 F. App'x 563, 569 (6th Cir. 2009.) ("[A] doctor's report that merely repeats the patient's assertions is not credible, objective medical evidence.").

For the reasons explained above, the Court finds that the ALJ properly evaluated Dr. Brittner's medical opinion evidence, and substantial evidence supports his reasoning and conclusions.   Accordingly, Plaintiff's first contention of error is without merit.

**B.   Sentence Six Remand**

Plaintiff asserts that remand is warranted for consideration of new and material evidence. Sentence six of 42 U.S.C. § 405(g) provides in relevant part as follows:

> The Court may, on motion of the Secretary made for good cause shown before he files his answer, remand the case to the Secretary for further action by the Secretary, and it may at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42. U.S.C. § 405(g).   The Court may remand a case to the Commissioner for consideration of additional evidence only if the party seeking remand demonstrates that 1) there is good cause for the failure to incorporate this evidence into the record at the prior hearing and 2) the evidence is new and material.   42 U.S.C. § 405(g); *Melkonyan*, 501 U.S. 89, 98 (1991); *Willis v. Sec'y of H.H.S.*, 727 F.2d 551, 553–54 (6th Cir.1984).

To show good cause, the moving party must present a valid justification for the failure to have acquired and presented the evidence in the prior administrative proceeding.   *Oliver v. Sec'y of H.H.S.*, 804 F.2d 964, 966 (6th Cir. 1986); *Willis*, 727 F.2d at 554.   To be "material" within the

meaning of § 405(g), the new evidence 1) must be relevant and probative to plaintiff's condition prior to the Commissioner's decision and 2) must establish a reasonable probability that the Commissioner would have reached a different decision if the evidence had been considered. *Sizemore v. Sec'y of H.H.S.*, 865 F.2d 709, 711 (6th Cir. 1988); *Oliver*, 804 F.2d at 966; *Humphries v. Comm'r of Soc. Sec.*, No. 1:13-CV-377, 2014 WL 2048186, at *4 (S.D. Ohio May 19, 2014).

"Evidence is new only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 484 (6th Cir. 2006) (quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)). Further evidence on an issue already fully considered by the Commissioner is cumulative, and is not sufficient to warrant remand. *Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir.1980); *Kitts v. Colvin*, No. 2:15-CV-2319, 2016 WL 4537698, at *6 (S.D. Ohio Aug. 30, 2016). Evidence that plaintiff's condition has deteriorated since the Commissioner's decision is not material. *Sizemore*, 865 F.2d at 712; *Oliver*, 804 F.2d at 966. If plaintiff has experienced serious deterioration since the Commissioner's decision, the appropriate remedy is to file a new application. *Sizemore*, 865 F.2d at 712; *Crawford v. Comm'r of Soc. Sec.*, No. 2:16-CV-799, 2017 WL 1968067, at *4 (S.D. Ohio May 12, 2017).

A review of Plaintiff's additional evidence reveals that Dr. Naskar's June 22, 2016, medical source statement is not new for the purposes of a Sentence Six remand. (R. at 186-187.) Plaintiff, who bears the burden on this question, provides no valid reason why Dr. Naskar could not have provided his medical source statement in January 2016. Plaintiff provided medical evidence from Dr. Naskar through the end of January 2016, suggesting that he could have completed a medical source statement in time to be considered by the ALJ. (R. at 1533-1535.)

Further, the medical evidence concerning Plaintiff's shoulder condition appears to document a new injury that occurred after the ALJ's ruling. Plaintiff fell at least twice between February and April 2016. (R. at 79, 95, 167-169.) Plaintiff reported that he was "doing well" in January and February 2016 after surgery on his shoulder but began experiencing increased pain following his late-February 2016 fall. (R. at 79, 95.) Prior to the fall, Plaintiff was successfully pursuing physical therapy, but had to discontinue, on doctor's orders, following the fall. (R. at 78-79, 95.) In April 2016, Plaintiff reported another fall, after which he has experienced "severe" pain and "can no longer even lift a coffee cup." (R. at 168.) The evidence submitted to the Appeals Council describes a promising recovery from shoulder surgery at the time of the ALJ's decision followed by a new injury. One of his doctors characterized his falls as "nasty" and speculated that Plaintiff "tor[e] a portion of his subscapularis . . . . Perhaps he knocked his glenoid component loose with one of these falls." (R. at 181.) Plaintiff subsequently underwent surgery to remove the glenoid component from his right shoulder, which his doctor found to be "an obvious source of his pain. This loose glenoid component is consistent with multiple traumas in the postoperative time period." (R. at 184-185.) Rather than new evidence regarding Plaintiff's pre-January 2016 condition, Plaintiff's records document a new condition arising sometime between late February and April 2016.

Similarly, Dr. Vollmar's May 31, 2016, medical source statement comes so closely on the heels of Plaintiff's new injuries that any evidence it may contain related to his shoulder condition must be considered evidence of those same new injuries. (R. at 196-197.) Plaintiff's medical records are unanimous that he experienced a serious shoulder trauma that interrupted his promising recovery. (R. at 78-79, 95-96, 168, 181.) It is simply too great a logical leap to suggest that medical evidence after Plaintiff's multiple falls is relevant to and probative of

plaintiff's condition prior to the Commissioner's decision. *Sizemore* 865 F.2d at 711. Plaintiff's remedy in this situation is to file a new application. *Sizemore*, 865 F.2d at 712; *Crawford v. Comm'r of Soc. Sec.*, No. 2:16-CV-799, 2017 WL 1968067, at *4 (S.D. Ohio May 12, 2017).

For the reasons explained above, the Court finds that Plaintiff's additional evidence is not new and material and that remand under Sentence Six is not appropriate. Accordingly, Plaintiff's second contention of error is without merit.

## VII.  CONCLUSION

In conclusion, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, the Commissioner of Social Security's decision is **AFFIRMED** and Plaintiff's Statement of Errors is **OVERRULED**. The Clerk is **DIRECTED** to enter final judgment in this case.

**IT IS SO ORDERED.**

Date:  March 26, 2018                       */s/ Elizabeth A. Preston Deavers*
                                          ELIZABETH A. PRESTON DEAVERS
                                          CHIEF UNITED STATES MAGISTRATE JUDGE

23